Kenneth E. SUTTON, Jr.,
Plaintiff–Appellant,

v.

PROVIDENCE ST. JOSEPH MEDICAL CENTER, a California non-profit corporation, Defendant–Appellee.

No. 99–55050.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 11, 1999

Filed Sept. 16, 1999

Ross S. Heckmann, Arcadia, California, for the plaintiff-appellant.

Douglas R. Hart, Derek R. Havel, Sheppard, Mullin, Richter & Hampton, Los Angeles, California, for the defendant-appellee.

Before: JOHN T. NOONAN, DAVID R. THOMPSON, and SUSAN P. GRABER, Circuit Judges.

GRABER, Circuit Judge:

Defendant, the Providence St. Joseph Medical Center, refused to hire plaintiff Kenneth E. Sutton, Jr., after he failed to provide a social security number as required by federal law. Plaintiff brought this action alleging that Defendant thereby violated Title VII of the 1964 Civil Rights Act, as amended (Title VII), 42 U.S.C. § 2000e *et seq.;* the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.;* the free speech guarantee of the First Amendment; the Privacy Act, 5 U.S.C. § 552a; and the Paperwork Reduction Act, 44 U.S.C. § 3512. Plaintiff also brought various state claims. The district court dismissed the federal claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and, thereafter, refused to exercise supplemental jurisdiction over the state claims. For the reasons that follow, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

"Because this is an appeal from the dismissal of an action pursuant to Fed. R.Civ.P. 12(b)(6), we accept as true the facts alleged in the complaint." *Zimmerman v. Oregon Dep't of Justice,* 170 F.3d 1169, 1171 (9th Cir.1999), *petition for cert. filed,* No. 99–243 (Aug. 10, 1999).

On June 25, 1997, Defendant offered Plaintiff a position as a Senior Network Analyst. Plaintiff accepted. Before he could begin working for Defendant, however, Plaintiff was required to fill out employment forms that required, among other information, his social security number. Plaintiff believes that a social security number is the "Mark of the Beast" prophesied in the Book of Revelations, Chapters 13 and 14. Plaintiff therefore told Defendant that his religion prevented him from providing such a number. Because Plaintiff would not provide his social security

number, Defendant refused to hire Plaintiff.

On February 24, 1998, Plaintiff brought this action, alleging that Defendant had violated Title VII, RFRA, the First Amendment, the Privacy Act, and various state constitutional provisions and laws. On June 1, 1998, Plaintiff amended his complaint to allege, in addition, that Defendant had violated the Paperwork Reduction Act. Thereafter, Defendant moved to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion, dismissing Plaintiff's federal claims with prejudice. The district court then declined to exercise supplemental jurisdiction over Plaintiff's state claims and, accordingly, the court dismissed those claims without prejudice. This timely appeal ensued.

## STANDARD OF REVIEW

The district court granted Defendant's Federal Rule of Civil Procedure 12(b)(6) motion. This court reviews such a decision de novo. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir.1998).

## TITLE VII

Title VII provides in part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire ... any individual ... because of such individual's ... religion ... [.]

42 U.S.C. § 2000e–2(a)(1). "Religion" includes

all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).

■ This court has adopted a two-part test for analyzing religious discrimi-

nation claims under Title VII. *See Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir.1999) (en banc). First, "the employee must establish a prima facie case [of discrimination] by proving that (1) she had a bona fide religious belief, the practice of which conflicted with an employment duty; (2) she informed her employer of the belief and conflict; and (3) the employer threatened her or subjected her to discriminatory treatment, including discharge, because of her inability to fulfill the job requirements." *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir.1998). "[I]f the employee proves a prima facie case of discrimination, the burden shifts to the employer to show either that it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Id.*

■ It is uncontested that (1) Plaintiff sincerely believes that his religion prevents him from providing a social security number, (2) Plaintiff informed Defendant of his belief, and (3) Defendant refused to hire Plaintiff because he did not provide Defendant with a social security number. Nevertheless, Defendant argues, and the district court held, that Plaintiff cannot establish a prima facie case, because Defendant is required by law to obtain Plaintiff's social security number. Specifically, the Immigration and Naturalization Service (INS), 8 C.F.R. § 274a.2(a) & (b)(1)(i), 8 C.F.R. § 274a.10(b)(2); Immigration Form I–9; and the Internal Revenue Code (IRC), 26 U.S.C. § 6109(a)(3) & (d), require employers to provide the social security numbers of their employees.

Although they have disagreed on the rationale, courts agree that an employer is not liable under Title VII when accommodating an employee's religious beliefs would require the employer to violate federal or state law. This court has held that the existence of such a law establishes "undue hardship" (rather than prevents an

employee from establishing a prima facie case). *See Bhatia v. Chevron U.S.A., Inc.,* 734 F.2d 1382, 1383–84 (9th Cir.1984) (holding that the employee established a prima facie case, but that the employer demonstrated undue hardship; the requested accommodation "would risk liability for violating California Occupational Safety and Health Administration standards"). The Tenth Circuit has applied this approach specifically to a case in case in which a plaintiff challenged his employer's request for a social security number:

> Under federal law, all employers are required to withhold certain income taxes and social security taxes and file a report with the Internal Revenue Service as to each individual employee. These reports require identification of the employee by social security number. Requiring Defendant to violate these laws in order to accommodate Plaintiff['s religious beliefs] would result in undue hardship to Defendant.

*Weber v. Leaseway Dedicated Logistics, Inc.,* No. 98–3172, 1999 WL 5111, at *1 (10th Cir.1999) (unpublished disposition) (citations omitted).[1]

Pursuant to *Bhatia,* we hold that Defendant established that accommodation would cause "undue hardship" as a matter of law. We therefore affirm the district court's dismissal of Plaintiff's Title VII claim.

### RFRA

Plaintiff next alleges that Defendant violated RFRA. The district court dismissed Plaintiff's claim, holding that (1) the Supreme Court in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), held that RFRA was unconstitutional as applied to federal law, and (2) Defendant was not acting under "color of law" as required by RFRA. We disagree with the district court that *City of Boerne*

invalidated RFRA as applied to federal law, but we agree that Plaintiff cannot state a RFRA claim against Defendant, a private employer, in the circumstances presented.

### A. Scope of the Decision in City of Boerne

■ In *Employment Division v. Smith,* 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court held that the Free Exercise Clause ordinarily does not "relieve" a religious adherent from compliance with a neutral, generally applicable law. Congress enacted RFRA in response to that decision. RFRA was an attempt "to provide a claim or defense to persons whose religious exercise is substantially burdened by government" and "to restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)[,] and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)." 42 U.S.C. § 2000bb(b) (parallel citations omitted).

In *City of Boerne,* a church brought a RFRA challenge to a local zoning board's denial of a building permit. 117 S.Ct. at 2160. The Supreme Court rejected the church's claim, holding that RFRA was unconstitutional.

The Court focused its analysis on Congress' power to enact legislation under section 5 of the Fourteenth Amendment, because "Congress relied on its Fourteenth Amendment enforcement power in enacting the most far reaching and substantial of RFRA's provisions, *those which impose its requirements on the States.*" *Id.* at 2162 (emphasis added). The Court held that section 5 of the Fourteenth Amendment gives Congress the power "to enforce" the "provisions of this article." *Id.* at 2163 (citation and internal quotation

---

1. Pursuant to Tenth Circuit Rule 36.3(B), an order and judgment (unpublished disposition) may be cited if "(1) it has persuasive value with respect to a material issue that has not

been addressed in a published opinion" and "(2) it would assist the court in its disposition."

marks omitted). The section thus gives Congress the power to remedy violations of the Fourteenth Amendment; it does not, however, give Congress the power to declare the substance of that Amendment: "The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States. Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause." *Id.* at 2164.

Analyzing RFRA, the Court held that it was not a "remedial" statute, because it lacked any "congruence" or "proportionality" to its purported remedial purpose. *See id.* at 2164, 2170. Instead, Congress had impermissibly attempted "a substantive change in constitutional protections." *Id.* at 2170.

As is apparent, *City of Boerne* involved a constitutional challenge to RFRA as applied to local (and state) law, not federal law. What is more important, the Court focused its analysis on whether Congress had the power under section 5 of the Fourteenth Amendment to enact RFRA. *See id.* at 2162. Congress, however, does not enact legislation regulating the *federal* government pursuant to section 5 of the Fourteenth Amendment; Congress acts under that section only when regulating the conduct of the states. *See Christians v. Crystal Evangelical Free Church (In re Young),* 141 F.3d 854, 858 (8th Cir.) ("By its terms, the Fourteenth Amendment is applicable only to the states, and not to the federal government."), *cert. denied,* —— U.S. ——, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998); Thomas C. Berg, *The Constitutional Future of Religious Freedom Legislation,* 20 U. Ark. Little Rock L.J. 715, 728 (1998) ("The application of RFRA to federal law obviously does not rest on Section 5 and could not have been intended to do so, since the Fourteenth Amendment is only concerned with state action.").

Not surprisingly, then, most courts that have considered the issue have concluded that the Supreme Court invalidated RFRA only as applied to state and local law. *See Adams v. Commissioner,* 170 F.3d 173, 175 n. 1 (3d Cir.1999) ("In general, courts that have addressed the question of constitutionality have found that RFRA is constitutional as applied to the federal government."); *In re Young,* 141 F.3d at 858 ("The [*City of Boerne* ] Court did not reach any decision as to the constitutionality of RFRA as applied to federal law."); *cf. Spies v. Voinovich,* 173 F.3d 398, 403 (6th Cir.1999) ("[T]he Supreme Court has declared [RFRA] unconstitutional as applied to the states."); *Peterson v. Shanks,* 149 F.3d 1140, 1145 (10th Cir.1998) (characterizing *City of Boerne* as "holding that RFRA is unconstitutional as applied to state governments").

Defendant, however, seizes on the opening and conclusion of the Court's opinion in *City of Boerne.* In those parts of the opinion, the Court mentioned separation-of-powers principles:

> Under our Constitution, the Federal Government is one of enumerated powers. The judicial authority to determine the constitutionality of laws, in cases and controversies, is based on the premise that the powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.
>
> . . . .
>
> Our national experience teaches that the Constitution is preserved best when each part of the government respects both the Constitution and the proper actions and determinations of the other branches. When the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is. When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its

precedents with the respect due them under settled principles, including *stare decisis*, and contrary expectations must be disappointed. RFRA was designed to control cases and controversies, such as the one before us; but as the provisions of the federal statute *here invoked* are beyond congressional authority, it is this Court's precedent, not RFRA, which must control.

117 S.Ct. at 2162, 2172 (citations and internal quotation marks omitted) (emphasis added). Defendant asserts that those principles served as an independent basis for the Court's decision.

Defendant is correct that the Court in *City of Boerne* mentioned separation-of-powers principles, but is incorrect that those principles served as an independent basis for invalidating RFRA as applied to the local and state law at issue in the case. The Court mentioned those principles only upon concluding that Congress did not "act[ ] within its sphere of power and responsibilities." *City of Boerne*, 117 S.Ct. at 2171. *Without a constitutional basis for its enactment*, RFRA was an impermissible attempt to interpret the Free Exercise Clause. In the circumstances, RFRA violated separation-of-powers principles. Viewed in context, the Court's discussion of separation-of-powers principles did not serve as an independent basis for invalidating RFRA, as applied to state law, but was a corollary to the Court's conclusion that no Constitutional provision autho-

rized Congress to pass RFRA with respect to the states.[2]

Finally, Defendant cites some lower-court cases that, without any analysis, have concluded that *City of Boerne* bars a federal RFRA claim. *See Branch Ministries, Inc. v. Richardson*, 970 F.Supp. 11, 13 n. 1 (D.D.C.1997); *Geltzer v. Crossroads Tabernacle (In re Rivera)*, 214 B.R. 101, 102 n. 1 (Bankr.S.D.N.Y.1997); *In re Andrade*, 213 B.R. 765, 772 (Bankr.E.D.Cal. 1997); *In re Gates Community Chapel of Rochester, Inc.*, 212 B.R. 220 (Bankr. W.D.N.Y.1997). Because those cases give no consideration to whether the Supreme Court, in fact, intended to invalidate RFRA as applied to federal law, they are not persuasive authority. *See Zimmerman*, 170 F.3d at 1183–84 ("Because of the limited analysis performed in those cases[,] ... we simply do not find them persuasive."); *see also* Todd J. Zywicki, *Rewrite the Bankruptcy Laws, Not the Scriptures: Protecting a Bankruptcy Debtor's Right to Tithe*, 1998 Wis. L.Rev. 1223, 1248 (1998) ("Many bankruptcy courts ... have ignored the subtleties of the Court's decision in *Boerne* and have blithely declared RFRA invalid.") (footnotes omitted).

### B. *Constitutionality of RFRA*

Defendant argues that, even if the Supreme Court did not wholly invalidate RFRA already in *City of Boerne*, RFRA nevertheless is unconstitutional as applied to federal law.[3] We assume, without de-

---

2. Several commentators agree with our analysis. *See, e.g.*, Edward J.W. Blatnik, *No RFRAF Allowed: The Status of the Religious Freedom Restoration Act's Federal Application in the Wake of City of Boerne v. Flores*, 98 Colum. L.Rev. 1410, 1423–24 (1998); Daniel A. Crane, *Beyond RFRA: Free Exercise of Religion Comes of Age in the State Courts*, 10 St. Thomas L.Rev. 235, 241 (1998); Richard Collin Mangrum, *Tithing, Bankruptcy and the Conflict Between Religious Freedom and Creditor's Interests*, 32 Creighton L.Rev. 815, 828–29 (1999).

3. Defendant has not argued (and cannot successfully argue) that RFRA is not severable. *See INS v. Chadha*, 462 U.S. 919, 931–32, 103

S.Ct. 2764, 77 L.Ed.2d 317 (1983) ("[T]he invalid portions of a statute are to be severed [u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not.") (citation and internal quotation marks omitted) (alteration in original); *Christians v. Crystal Evangelical Free Church (In re Young)*, 141 F.3d 854, 859 (8th Cir.) ("RFRA's protection against federal interference with religious liberties is independent and distinct from its protection against state interference, and there is nothing in RFRA's text or legislative history to suggest that Congress would have declined to protect religious liberties from federal interference merely because it was unable to protect those

ciding, that RFRA is constitutional as applied to federal law. *See Carreras v. City of Anaheim*, 768 F.2d 1039, 1042 (9th Cir. 1985) ("[F]ederal courts should avoid the adjudication of federal constitutional issues when alternative grounds are available."); *see also Alamo v. Clay*, 137 F.3d 1366, 1368 (D.C.Cir.1998) (assuming, without deciding, that RFRA is constitutional as applied to federal law); *United States v. Grant*, 117 F.3d 788, 792 n. 6 (5th·Cir.1997) (same). We hold, instead, that Plaintiff cannot state a valid claim under RFRA against Defendant, a private employer, in the circumstances presented.

## C. Color of Law

### 1. Statutory Wording

RFRA provides that the

> [g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section[.]

42 U.S.C. § 2000bb–1. RFRA, in turn, defines "government" to include "a branch, department, agency, instrumentality, and official (or other person *acting under color of law* ) of the United States." 42 U.S.C. § 2000bb–2(1) (emphasis added).

As an initial matter, we note that RFRA does not expressly include private employers within its reach. When Congress has intended to regulate private employers, in statutes such as Title VII and the Americans with Disabilities Act (ADA), it has done so explicitly. *See* 42 U.S.C. § 2000e(b) (Title VII) ("The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person."); 42 U.S.C. § 12111(2)(ADA) ("The term 'covered entity' means any employer, employ-

ment agency, labor organization, or joint-labor management committee."). Congress chose not to include similar wording in RFRA. Ordinarily, this court must give effect to such a difference in wording. *See Government of Guam ex rel. Guam Econ. Dev. Auth. v. United States*, 179 F.3d 630, 638 (9th Cir.1999) (stating that, when Congress includes a provision in one statute but not in another, the court must give effect to the difference in wording), *as amended*, 1999 WL 604218 (9th Cir. Aug.12, 1999).

■ We also note another guide to the interpretation of statutes. When a statute contains a list of specific items and a general item, we usually deem the general item to be of the same category or class as the more specifically enumerated items. *See United States v. Lacy*, 119 F.3d 742, 748 (9th Cir.1997) ("This interpretation is supported by two principles of statutory interpretation, *noscitur a sociis* and *ejusdem generis*. The first means that a word is understood by the associated words, the second, that a general term following more specific terms means that the· things embraced in the general term are of the same kind as those denoted by the specific terms.") (citation and internal quotation marks omitted), *cert. denied*, —— U.S. ——, 118 S.Ct. 1571, 140 L.Ed.2d 804 (1998); *United States v. Baird*, 85 F.3d 450, 453 (9th Cir.1996) (stating a similar proposition). Here, the enumerated list includes parts of government and agents acting on behalf of government, not purely private entities. Ordinarily, we would interpret the phrase "acting under color of law" accordingly.

■ Nevertheless, we are not writing on a clean slate. Congress has used the key phrase—"acting under color of law"—before in other statutes, including 42 U.S.C. § 1983. "[W]hen a legislature borrows an already judicially interpreted

liberties from state interference."), *cert. denied*, —— U.S. ——, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998).

phrase from an old statute to use it in a new statute, it is presumed that the legislature intends to adopt not merely the old phrase but the judicial construction of that phrase." *Long v. Director, Office of Workers' Comp. Programs,* 767 F.2d 1578, 1581 (9th Cir.1985) (citation and internal quotation marks omitted). In the circumstances, the judicial interpretation of the phrase "acting under color of law," as used in 42 U.S.C. § 1983, applies equally in this RFRA action. *See Brownson v. Bogenschutz,* 966 F.Supp. 795, 797 (E.D.Wis. 1997) ("Because the statutory definition of 'government' under RFRA includes any person 'acting under color of law,' 42 U.S.C. § 2000bb–2(1), the required degree of [government] action under RFRA is analyzed under the same standard as § 1983."); *cf. Hall v. American Nat'l Red Cross,* 86 F.3d 919, 921–22 (9th Cir.1996) (applying the "state action" requirement from the First Amendment to determine what constitutes federal action under RFRA).

### 2. Analytical Framework

■ "The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights fairly attributable to the [government]?" *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (citation and internal quotation marks omitted); *see also Kitchens v. Bowen,* 825 F.2d 1337, 1340 (9th Cir.1987) ("[T]he standards utilized to find federal action ... are identical to those employed to detect state action.") (citation and internal quotation marks omitted). As this court has recognized in *Collins v. Womancare,* 878 F.2d 1145, 1151 (9th Cir.1989), the Supreme Court has adopted a two-part test for answering that question.

■ First, the deprivation must result from a governmental policy. *See id.* In other words, the deprivation "must be caused by the exercise of some right or privilege created by the [government] or a rule of conduct imposed by the [government]." *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Neither party disputes that the IRC and INS requirements that employers obtain their employees' social security numbers satisfy this criterion. Both are rules of conduct imposed by the federal government that caused Plaintiff's deprivation.

■ Second, "the party charged with the deprivation must be a person who may fairly be said to be a [governmental] actor." *Id.* The Court adopted that test because " § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrong." *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 119 S.Ct. 977, 985, 143 L.Ed.2d 130 (1999) (citation and internal quotation marks omitted). Indeed, "[w]ithout a limit such as this, private parties could face ... litigation whenever they seek to rely on some ... rule governing their interactions with the community surrounding them." *Lugar,* 457 U.S. at 937, 102 S.Ct. 2744.

■ When addressing whether a private party acted under color of law, we therefore start with the presumption that private conduct does not constitute governmental action. *See Harvey v. Harvey,* 949 F.2d 1127, 1130 (11th Cir.1992) ("Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes."); *Price v. Hawaii,* 939 F.2d 702, 707–08 (9th Cir.1991) ("[P]rivate parties are not generally acting under color of state law."). In order for private conduct to constitute governmental action, "something more" must be present. *See Lugar,* 457 U.S. at 939, 102 S.Ct. 2744 ("Action by a private party pursuant to this statute, without something more, was not sufficient to justify a characterization of that party as a 'state actor.' "). Courts have used four different factors or tests to identify what constitutes "something more": (1) public function, (2) joint action, (3) govern-

mental compulsion or coercion, and (4) governmental nexus. *See id.; Johnson v. Knowles,* 113 F.3d 1114, 1118 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 559, 139 L.Ed.2d 401 (1997); *Parks Sch. of Bus., Inc. v. Symington,* 51 F.3d 1480, 1486 (9th Cir.1995); *Gorenc v. Salt River Project Agric. Improvement and Power Dist.,* 869 F.2d 503, 506 (9th Cir.1989).[4]

"While these factors are helpful in determining the significance of state involvement, there is no specific formula for defining state action." *Howerton v. Gabica,* 708 F.2d 380, 383 (9th Cir.1983) (citation and internal quotation marks omitted); *see also Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) ("[T]o fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an impossible task which [t]his Court has never attempted.") (citation and internal quotation marks omitted); *Lugar,* 457 U.S. at 939, 102 S.Ct. 2744 ("The Court suggested that that 'something more' which would convert the private party into a state actor might vary with the circumstances of the case."); *Ouzts v. Maryland Nat'l Ins. Co.,* 505 F.2d 547, 550 (9th Cir.1974) ("It is also a truism by now that there is no rigid formula for measuring state action for purposes of section 1983 liability."). Instead, "[c]ontemporary decisions stress the necessity of a *close nexus* between the state and the challenged conduct rather than application of a mechanistic formula." *Wagner v. Metropolitan Nashville Airport Auth.,* 772 F.2d 227, 229 (6th Cir.1985) (emphasis added); *see also Grijalva v. Shalala,* 152 F.3d 1115, 1119 (9th Cir.1998) ("In order to show that a private action is in fact state action, the plaintiff must show that there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the

State itself.") (citation and internal quotation marks omitted), *vacated on other grounds by* —— U.S. ——, 119 S.Ct. 1573, 143 L.Ed.2d 669 (1999). "Under any formula, however, the inquiry into whether private conduct is fairly attributable to the state must be determined based on the circumstances of each case." *Bass v. Parkwood Hosp.,* 180 F.3d 234, 242 (5th Cir.1999). "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton,* 365 U.S. at 722, 81 S.Ct. 856; *see also Howerton,* 708 F.2d at 383 (stating the same principle).

### 3. *Compulsion*

▮▮ Plaintiff argues that, because the federal government compels every employer to obtain employees' social security numbers, every employer is liable under RFRA for violating the rights of employees (or applicants) who object on religious grounds to the social-security-number requirement. We are not persuaded.

#### a. *Government Defendant*

The compulsion analysis originated in cases in which the government itself, not a private entity, was the defendant. The Court first applied the analysis in *Peterson v. City of Greenville,* 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963). There, a city ordinance required separation of the races in restaurants. *See id.* at 246, 83 S.Ct. 1119. The manager of a private restaurant refused to serve the plaintiffs, who were African–American. *See id.* at 245–46, 83 S.Ct. 1119. The Court held that the city could not escape responsibility merely because a private entity actually carried out the discrimination:

It cannot be denied that here the City of Greenville, an agency of the State,

4. The Court in *Lugar* stated that "[w]hether these different tests are actually different in operation or simply different ways of characterizing the *necessarily fact-bound inquiry* that

confronts the Court in such a situation need not be resolved here." 457 U.S. at 939, 102 S.Ct. 2744 (emphasis added).

has provided by its ordinance that the decision as to whether a restaurant facility is to be operated on a desegregated basis is to be reserved to it. When the State has commanded a particular result, it has saved to itself the power to determine that result and thereby "to a significant extent" has "become involved" in it, and, in fact, has removed that decision from the sphere of private choice. It has thus effectively determined that a person owning, managing or controlling an eating place is left with no choice of his own but must segregate his white and Negro patrons. The Kress management, in deciding to exclude Negroes, did precisely what the city law required.

*Id.* at 247–48, 83 S.Ct. 1119.

Similarly, in *Lombard v. Louisiana,* 373 U.S. 267, 271, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963), the Mayor of New Orleans issued an "unequivocal statement condemning" sit-in activity at segregated private restaurants. The Mayor also "demand[ed] its cessation." *Id.* Four days later, the plaintiffs engaged in a sit-in at such a restaurant. *See id.* at 268, 271, 83 S.Ct. 1122. Pursuant to the Mayor's order, the private restaurant refused to serve plaintiffs, contacting the police instead. *See id.* at 268, 272, 83 S.Ct. 1122. As in *Peterson,* the Court held that the city could not escape responsibility on the ground that a private entity engaged in the discrimination that the city demanded through the statements of the Mayor. *See id.* at 273–74, 83 S.Ct. 1122.

The Court explained the compulsion analysis further in *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). In *Blum,* Medicaid patients brought a class action against the state, arguing that nursing homes were discharging or transferring patients without notice or an opportunity to be heard. *See id.* at 993, 102 S.Ct. 2777. The Court noted that federal regulations required nursing homes to "periodically assess[ ] whether each patient is receiving the appropriate

level of care, and thus whether the patient's continued stay in the facility is justified." *Id.* at 994–95, 102 S.Ct. 2777. The Court held that, although the state required the assessment, the "decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." *Id.* at 1008, 102 S.Ct. 2777. Thus, in the circumstances, the state did not compel any particular decision whether to transfer or discharge a patient, which was the alleged unlawful activity and, accordingly, was not liable for the decisions of the doctors at the nursing home. *See id.* at 1004–05, 102 S.Ct. 2777.

Under the foregoing precedent, governmental compulsion alone provides a sufficient nexus so that it is fair to attribute a private entity's conduct to the government.

### b. *Private Defendant*

Plaintiff did not bring this action against the federal government, however; rather, he sued a private employer. Plaintiff argues that governmental compulsion in the simple form of a generally applicable statutory requirement, without more, likewise is sufficient to hold a private employer responsible as a governmental actor.

We note initially that some circuits have suggested that they agree with Plaintiff. *See NBC v. Communications Workers of Am.,* 860 F.2d 1022, 1025 n. 4 (11th Cir. 1988) ("While specifically the *Blum* court spoke of holding the state liable pursuant to state action doctrine, the standard remains constant when a party seeks to hold a private actor liable under the state action doctrine."); *Frazier v. Board of Trustees of N.W. Miss. Reg'l Med. Ctr.,* 765 F.2d 1278, 1284–85 n. 12 (5th Cir.1985) ("*Blum* ... involved an effort to hold state officials liable for the conduct of private parties.... While the present suit ... [involves a private defendant], the analysis of state action under either brand of facts is largely if not wholly the same."); *Carter v. Norfolk Community Hosp. Ass'n,* 761 F.2d 970, 972 (4th Cir.1985) ("Here, the Hospi-

tal, not the State, is the defendant, but as the Supreme Court pointed out in *Blum*, the principle is the same."); *see also Starnes v. Capital Cities Media, Inc.*, 39 F.3d 1394, 1396 (7th Cir.1994) (similar).

Other circuits, however, have suggested that a plaintiff must show "something more" than state compulsion in order to hold a private defendant liable as a governmental actor. *See, e.g., Carey v. Continental Airlines, Inc.*, 823 F.2d 1402, 1404 (10th Cir.1987) ("When a constitutional claim is asserted against private parties, to be classified as state actors under color of law they must be jointly engaged with state officials in the conduct allegedly violating the federal right. This concerted action constitutes both the state action essential to establish a constitutional violation, and action under color of state law, custom or usage.") (footnote and citations omitted).

We agree with the Tenth Circuit's analysis. We believe that Plaintiff's approach does not follow from *Peterson, Lombard,* or *Blum.* As the Court explained in *National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 192, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988):

> In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action.

In *Peterson, Lombard,* and *Blum,* the Court applied this principle and held that *the government* cannot escape liability when it compels a result, even though the government does not actually engage in the unlawful act but, instead, pressures another to do so. In such circumstances, the state is undeniably the party who is "responsible" for that act.

By contrast, in a case involving a private defendant, the mere fact that the government compelled a result does not suggest that the government's action is "fairly attributable" to the private defendant. Indeed, without some other nexus between the private entity and the government, we would expect that the private defendant is *not* responsible for the government's compulsion:

> The logical conclusion of *Peterson* is that only the state actor, and not the private party, should be held liable for the constitutional violation that resulted from the state compulsion. When the state compels a private party to discriminate against members of a racial minority, it is the state action, not the private conduct, which is unconstitutional....
>
> ... [A] private party in such a case is "left with no choice of his own" and consequently should not be deemed liable.

Barbara Rook Snyder, *Private Motivation, State Action, and the Allocation of Responsibility for Fourteenth Amendment Violations,* 75 Cornell L.Rev. 1053, 1067, 1069 (1990) (footnote omitted); *see also King v. Massarweh,* 782 F.2d 825, 829 (9th Cir.1986) ("The question is whether [the private defendant] is sufficiently connected with the clear state action in this case to have caused these acts to occur within the meaning of section 1983.").[5]

To accept Plaintiff's argument would be to convert every employer—whether it has one employee or 1,000 employees—into a governmental actor every time it complies with a presumptively valid, generally applicable law, such as an environmental standard or a tax-withholding scheme. Private employers would then be forced to defend those laws and pay any consequent damages, even though they bear no real

---

**5.** The court labeled this a "proximate cause" inquiry rather than an "under color of law" inquiry. *See King,* 782 F.2d at 829. Regardless of the label, the inquiry is the same: There must be some nexus between the wrongful act and the private entity. *Cf. Ar-* *nold v. International Bus. Machs. Corp.,* 637 F.2d 1350, 1356 (9th Cir.1981) ("If the actions of the state officers are not the proximate cause of the plaintiff's injuries, then there is no state action.").

responsibility for the violation of rights arising from the enactment of the laws. "Statutes and laws regulate many forms of purely private activity, such as contractual relations and gifts, and subjecting all behavior that conforms to state law to the Fourteenth Amendment would emasculate the [government] action concept." *Adams v. Southern Cal. First Nat'l Bank*, 492 F.2d 324, 330–31 (9th Cir.1974) (footnote omitted). Without some affirmative indication that Congress, the Supreme Court, or this court intended for every private entity to "be dragooned into [defending] federal law," *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 2381, 138 L.Ed.2d 914 (1997) (citation and internal quotation marks omitted), we decline to adopt such a requirement.

As noted above, the wording of RFRA does not suggest that Congress intended to subject employers to liability in the circumstances of this case. Further, we do not believe that Supreme Court precedent holds that governmental compulsion in the form of a general statute, without more, is sufficient to transform every private entity that follows the statute into a governmental actor.

For his contrary argument, Plaintiff relies on two Supreme Court cases in which the Court applied the compulsion factor to private defendants. *See San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 546–47, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (applying the factor in an action brought against a private entity); *Rendell–Baker*, 457 U.S. at 840–42, 102 S.Ct. 2764 (same). The Court, however, did not find compulsion in either case. *Cf. McDaniel v. Sanchez*, 452 U.S. 130, 141, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981) ("The discussion ... was dictum unnecessary to the decision in that case. It is, therefore, not controlling in this case."). Because the Court held that there was no compulsion, it never addressed the question that we must answer in this action: whether governmental compulsion in the form of a general statute, without

more, is sufficient to deem a private defendant a governmental actor. We therefore do not read either *San Francisco Arts & Athletics* or *Rendell–Baker* as supporting Plaintiff's argument.

Instead, we turn to *Blum* itself. There, the Court stated that "[t]his case is *obviously different from those cases in which the defendant is a private party* and the question is whether his conduct has sufficiently received the imprimatur of the State so as to make it 'state' action." *Blum*, 457 U.S. at 1003, 102 S.Ct. 2777 (emphasis added). This statement suggests, albeit only slightly, that the compulsion factor functions differently in cases "in which the defendant is a private party." *Id.*

Indeed, in each of the Supreme Court's private-defendant cases, there was some additional nexus that made it fair to deem the private entity a governmental actor in the circumstances. In *Lugar*, for example, the plaintiff sued private defendants who had used a Virginia prejudgment attachment procedure against him, alleging that the statutorily authorized procedure deprived him of property without due process of law. Pursuant to the challenged procedures, the private defendants had presented to a state court an ex parte petition alleging their belief that the plaintiff was disposing of his property in order to defeat the claims of potential creditors. "Acting upon that petition, a Clerk of the state court issued a writ of attachment, which was then executed by the County Sheriff." *Lugar*, 457 U.S. at 924, 102 S.Ct. 2744. The Court held that the private defendants who had initiated the attachment process could be liable as state actors for "participating in that deprivation": "[I]nvoking the aid of state officials to take advantage of state-created attachment procedures" made the private defendants "*willful participant[s] in joint activity* with the State or its agents." *Id.* at 942, 941, 102 S.Ct. 2744 (citation and internal quotation marks omitted) (emphasis added).

In *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 177, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), a private club had bylaws that prohibited non-Caucasians · from being members or guests. The state liquor control board had adopted a requirement that "[e]very club licensee shall adhere to all of the provisions of its Constitution and By-Laws." (citation and internal quotation marks omitted) (alteration in original). The private defendant was deemed to be acting in concert with the state when it sought the state's help to enforce the defendant's own racially discriminatory bylaws. Once again, the "something more" required for a finding of governmental action on the part of a private defendant was satisfied when the plaintiff alleged that the private defendant and the state were jointly pursuing an unconstitutional end.

Similarly, in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 149, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), a Caucasian school teacher attempted to eat lunch with six of her African–American students. The private restaurant refused her service. *See id.* As the plaintiff and her students were leaving, the plaintiff was arrested for vagrancy. *See id.* The plaintiff sued the restaurant, alleging that it had engaged in a conspiracy with the police to violate her rights. *See id.* at 150–52, 90 S.Ct. 1598. The Court allowed her conspiracy claim against the restaurant to go forward, holding that, "[a]lthough this is a lawsuit against a private party, not the State or one of its officials, our cases make clear that petitioner will have made out a violation of her Fourteenth Amendment rights and will be entitled to relief under § 1983 if she can prove that a Kress employee, in the course of employment, and a Hattiesburg policeman somehow reached an understanding to deny Miss Adickes service in the Kress store, or to cause her subsequent arrest." *Id.* at 152, 90 S.Ct. 1598.

By allowing the plaintiff to pursue this claim, the Court merely applied the well-accepted principle that a private party's joint participation in a conspiracy with the

state provides a sufficient nexus to hold the private party responsible as a governmental actor. *See Lugar,* 457 U.S. at 941, 102 S.Ct. 2744 ("[W]e have consistently held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor.'"); *see also Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting ... 'under color' of law for purposes of § 1983 actions."); *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L.Ed.2d 267 (19663)· ("Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents."); *Fonda v. Gray,* 707 F.2d 435, 437 (9th Cir.1983) ("A private party may be considered to have acted under color of state law when it engages in a conspiracy or acts in concert with state agents to deprive one's constitutional rights.").

The existence of a conspiracy between the private entity and state officials to pursue a joint and unconstitutional end distinguishes *Adickes* from this case; recall, here, that Defendant offered Plaintiff a position and would have hired him but for the government's social-security-number requirement. There was no *joint* effort to deprive Plaintiff of his constitutional rights.

The plaintiff in *Adickes* further alleged that the restaurant had refused her service pursuant to a state custom or policy. *See* 398 U.S. at 161, 90 S.Ct. 1598. The Court held that the plaintiff could prove an equal protection violation "if she proves that Kress refused her service because of a state-enforced custom of segregating the races in public restaurants." *Id.* at 171, 90 S.Ct. 1598. Plaintiff argues that this analysis demonstrates that governmental com-

pulsion, without more, is sufficient to hold a private defendant liable. Although Plaintiff's reading of *Adickes* is plausible, we do not believe that the Court intended such a broad holding.

As noted, there was substantial evidence in that case that the restaurant had conspired with state officials to violate the plaintiff's constitutional rights. Moreover, as Justice Powell later observed:

> The conduct in *Adickes* occurred in 1964, 10 years after *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and after the decade of publicized litigation that followed in its wake. In view of the intense national focus on issues of racial discrimination, it is virtually inconceivable that a private citizen then could have acted in the innocent belief that the state law and customs involved in *Adickes* still were presumptively valid.... In such a context, the private party *could* be characterized as hiding behind the authority of law and as engaging in "joint participation" with the State in the deprivation of constitutional rights.

*Lugar*, 457 U.S. at 955–56, 102 S.Ct. 2744 (Powell, J., dissenting) (joined by Justices Rehnquist and O'Connor) (emphasis in original) (footnote omitted); *see also* David Lagos, *Damned If You Do ... The Supreme Court Denies Qualified Immunity to Section 1983 Private Party Defendants in Wyatt v. Cole*, 71 N.C. L.Rev. 849, 864 (1993) ("[T]he private party's culpability in using state power was central to a finding of liability under *Adickes*."). In short, we do not read *Adickes* as a case in which a private defendant was held responsible merely for complying with a presumptively valid state law. Rather, in *Adickes*, the plaintiff alleged that the private defendant had deliberately discriminated against her based on her race, and was enabled to do so by "a longstanding and still prevailing state-enforced custom of segregating the races in public eating places." 398 U.S. at 173, 90 S.Ct. 1598. According to the Supreme Court, "a private person who discriminates on the basis of race with the knowledge of and pursuant to a state-enforced custom requiring such discrimination, *is a participant in joint activity with the State*, and is acting under color of that custom for purposes of § 1983." *Id.* at 174 n. 44, 90 S.Ct. 1598 (internal quotation marks omitted) (emphasis added). We emphasize again that Plaintiff does not allege here that Defendant intended to deprive him of his constitutional rights or that Defendant and the government acted jointly to do so.[6]

 In summary, Supreme Court precedent does not suggest that governmental compulsion in the form of a generally applicable law, without more, is sufficient to deem a private entity a governmental actor. Instead, the plaintiff must establish some other nexus sufficient to make it fair to attribute liability to the private entity. Typically, the nexus has consisted of participation by the state in an action ostensibly taken by the private entity, through conspiratorial agreement (*Adickes* ), official cooperation with the private entity to achieve the private entity's goal (*Lugar* ), or enforcement and ratification of the private entity's chosen action (*Moose Lodge* ).

Like the Supreme Court, this court has listed the compulsion factor in cases in-

---

**6.** We also note that some courts, including our own, have held that racial discrimination cases, such as *Adickes*, require less governmental action than other types of claims. *See Adams v. Southern California First Nat. Bank*, 492 F.2d 324, 333 (9th Cir.1973) ("[W]e are not convinced that the resolution of the state action question involving prejudgment self-help repossession of secured property is controlled by a case involving racial discrimination.") (collecting cases adopting a similar approach) (footnote omitted); *see also Jackson v. Statler Found.*, 496 F.2d 623, 628 (2d Cir.1974); *Greco v. Orange Mem'l Hosp. Corp.*, 513 F.2d 873, 879 (5th Cir.1975); Lawrence S. Kahn, *State Action and the "Under Color of Law" Requirement of 42 U.S.C.1983*, 553 PLI/Lit 567, 588 (1996). Because we hold that the private defendant's conduct in *Adickes* is distinguishable on other grounds, we do not rely on this alternative basis for distinguishing that case.

volving a private defendant. *See Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1202 (9th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 445, 142 L.Ed.2d 399 (1998); *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 708 (9th Cir.1997); *Morse v. North Coast Opportunities, Inc.*, 118 F.3d 1338, 1342 (9th Cir.1997); *Broad v. Sealaska Corp.*, 85 F.3d 422, 431 (9th Cir.1996); *Price*, 939 F.2d at 707–09; *Gorenc*, 869 F.2d at 508–09. In each of those cases, however, the court found no compulsion. Because those cases held that there was no compulsion, they never considered the question that we must face squarely here. *Cf. Ruff v. Sullivan*, 907 F.2d 915, 918 (9th Cir.1990) ("This panel is not bound by dicta from prior cases.") (citation and internal quotation marks omitted).

Plaintiff argues that this court held in *Mathis v. Pacific Gas & Elec. Co.*, 891 F.2d 1429 (9th Cir.1989), that governmental compulsion alone is sufficient to subject a private defendant to liability. We do not agree with Plaintiff's reading of *Mathis*.

In *Mathis*, a nuclear power plant conducted a covert drug operation, during which it suspected that one of its employees, Mathis, was using drugs. *See id.* at 1432–33. Thereafter, the company denied Mathis access to its facilities, allegedly without due process of law. *See id.* at 1433. Mathis asserted that the denial of access was "directed or encouraged" by the federal Nuclear Regulatory Commission (NRC), which had an informal policy that drug users were to be denied access to nuclear power plants. *See id.* at 1433–34. This court held that, if Mathis could prove the existence of such an informal policy, he could pursue an action against the private defendant, which was a licensee of the NRC. *See id.* at 1434.

In *Mathis*, the plaintiff alleged governmental compulsion. However, the plaintiff also alleged that the nuclear power plant and the NRC were "willful participant[s]

in joint activity." *Lugar*, 457 U.S. at 941, 102 S.Ct. 2744. The government went beyond merely requiring its nuclear licensees to exclude drug users from nuclear power plants. It "exercised coercive power [over] and provided significant encouragement" to the licensees toward that end. *Mathis*, 891 F.2d at 1433 (internal quotation marks omitted). The plaintiff alleged that the NRC and the private defendant had agreed to a division of labor in which the private defendant would take responsibility for preventing drug use at its facilities, in exchange for the NRC's not implementing formal regulations on the subject. *See id.* On those facts, the court concluded that the plaintiff had adequately alleged that his employer's actions could "be ascribed to a governmental decision." *Id.* at 1434 (citation and internal quotation marks omitted).[7]

*Mathis* is consistent with other Ninth Circuit precedent, which has required some participation by the state in the actions of the private defendant for a finding of governmental action. For example, in *Howerton*, private landlords sought to evict a tenant. *See* 708 F.2d at 384–85. During the eviction process, the landlords received substantial assistance from the police department. *See id.* The court held that, even if the landlords believed that they were "acting within their rights," *id.* at 385 n. 10, they engaged in "joint act[ion]" with the state, *id.* at 385. As in *Lugar*, the private defendants' willful choice to seek police assistance provided a sufficient nexus to deem them governmental actors. *See id.* at 384–85 ("The record, however, is replete with evidence that the [landlords] deliberately cloaked themselves with the authority of the state in effecting repossession of the trailer premises.").

In addition, *Mathis*, unlike this action, involved a public utility as a defendant. Of course, a public utility is not always or necessarily a state actor. *See Jackson v.*

---

7. On appeal after remand, this court held that the plaintiff had failed to prove that the NRC, in fact, had an informal policy as alleged. *See*

*Mathis v. Pacific Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir.1996).

*Metropolitan Edison Co.*, 419 U.S. 345, 350, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) ("The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment."). However, "[i]t may well be that acts of a heavily regulated utility with at least something of a *governmentally protected monopoly will more readily be found* to be state 'acts' than will the acts of an entity lacking these characteristics." *Id.* at 350–51, 95 S.Ct. 449 (emphasis added); *see also Adams*, 492 F.2d at 335 ("[W]e can distinguish the creditor's actions in our cases from the utility [termination cases] . . . on the basis of the greater extent to which the State has reserved power to control and regulate the operations of a public utility, and the greater amount of power given to the utility which is usually reserved to the State."). Because of the closer nexus between the government and a public utility, we are hesitant to apply a public-utility case as precedent in a private-employer case.

Plaintiff cites one additional case, *Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987). In *Carlin*, the plaintiff operated a "976" number that allegedly distributed sexually explicit materials to minors, in violation of state law. *See id.* at 1293. An Arizona deputy district attorney told the defendant, a telephone company, to terminate the plaintiff's service. *See id.* at 1295. The deputy district attorney threatened to prosecute the company if it did not comply. *See id.* Citing *Blum*, this court held that the telephone company could be held liable for the state's conduct: "With this threat, Arizona 'exercised coercive power' over Mountain Bell and thereby converted its otherwise private conduct into state action for purposes of § 1983." *Id.*

There are two key facts that distinguish this action from *Carlin*. First, the defendant in *Carlin* (like the defendant in *Mathis*) was a public utility. *See* Morgan W. Tovey, *Dial–A–Porn and the First Amendment: The State Action Loophole*, 40 Fed. Communications L.J. 267, 289 (1988) (analyzing *Carlin* and concluding that, "[b]ecause important First Amendment interests are at issue, the fact that the telephone company is a heavily regulated public utility assuming quasi-monopolistic control over the message medium should be accorded significant weight and tip the balance toward state action").

More importantly, however, all the other "compulsion" cases cited above—*Moose Lodge*, *Adickes*, and *Mathis*—like the present case, involved generally applicable laws (or customs). In each case, the question was whether there was a sufficient nexus between the private entity and the government's generally applicable requirement. In *Carlin*, on the other hand, the government directed a specific entity to take a specific (allegedly unconstitutional) action against a specific person. Action of a private defendant performed pursuant to such "particularized state participation," *Carlin*, 827 F.2d at 1295, is fairly attributable to the state, *cf. Blum*, 457 U.S. at 1004–05, 102 S.Ct. 2777. We do not read *Carlin* as applying to cases such as this, which involve only generally applicable laws.

In summary, Ninth Circuit precedent does not suggest that governmental compulsion, without more, is sufficient to deem a truly private entity a governmental actor in the circumstances of this case. Instead, the plaintiff must establish some other nexus sufficient to make it fair to attribute liability to the private entity as a governmental actor. Typically, the nexus consists of some willful participation in a joint activity by the private entity and the government. Plaintiff here fails to allege any such nexus.

### D. Conclusion

We affirm the district court's dismissal of Plaintiff's RFRA claim.

## FIRST AMENDMENT

Plaintiff next brought a *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), claim, alleging that Defendant violated his First Amendment right to freedom of speech. A *Bivens* claim, like a RFRA claim, can be brought only "against one who is engaged in governmental (or 'state') action." *Vincent v. Trend W. Technical Corp.,* 828 F.2d 563, 567 (9th Cir.1987) (citation and internal quotation marks omitted). "Whatever the proper standard for finding governmental action may be, it can be no *more* inclusive than the standard used to find state action for the purposes of section 1983." *Id.* (emphasis in original). As noted in the previous section, Plaintiff cannot satisfy the requirements of § 1983 (as incorporated in RFRA). We therefore affirm the district court's dismissal of Plaintiff's First Amendment claim.

## PRIVACY ACT

The district court dismissed Plaintiff's Privacy Act claim, in part because Defendant is not a federal agency. Section 7(a)(1) of the Privacy Act provides that "[i]t shall be unlawful for any Federal ... agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number." 5 U.S.C.A. § 552a (note). "The private right of civil action created by the Act is specifically limited to actions against agencies of the United States Government. The civil remedy provisions of the statute do not apply against private individuals ... [or] private entities." *Unt v. Aerospace Corp.,* 765 F.2d 1440, 1447 (9th Cir. 1985). Defendant is not a federal agency but, instead, is a private entity. The district court properly dismissed Plaintiff's Privacy Act claim.

## PAPERWORK REDUCTION ACT

Finally, Plaintiff brought a claim under the Paperwork Reduction Act. The district court dismissed that claim, holding that the Paperwork Reduction Act does not create a private right of action. The Paperwork Reduction Act provides:

(a) Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information that is subject to this chapter if [listing certain conditions].

(b) *The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto.*

44 U.S.C. § 3512 (emphasis added). As is apparent from subsection (b), the Act authorizes its protections to be used *as a defense.* The Act does not authorize a private right of action. That being so, the district court properly dismissed Plaintiff's Paperwork Reduction Act claim.

AFFIRMED.